COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com


Attorneys for Plaintiff
COASTAL ENVIRONMENTAL RIGHTS FOUNDATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> COMPUCRAFT INDUSTRIES, INC, a California corporation, <br><br> Defendant. | Civil Case No.: **'16 CV 1572 GPC DHB** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

Coastal Environmental Rights Foundation, ("CERF" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.    On August 21, 2015, Plaintiff issued a 60-day notice letter ("First Notice Letter") to Compucraft Industries, Inc. ("Compucraft" or "Defendant") regarding its violations of the Clean Water Act, and indicating Plaintiff's intention to file suit against Defendant.

3.    On April 14, 2016, Plaintiff issued a Second Notice Letter to Compucraft regarding its additional Clean Water Act violations and indicating Plaintiff's intent to file suit.

4.    The  First and Second Notice Letters were sent to the registered agent for Compucraft, as required by 40 C.F.R. § 135.2(a)(2), the Facility, as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). True and correct copies of the First Notice Letter and Second Notice Letter are attached hereto as Exhibit A and Exhibit B, respectively and are incorporated herein.

5.    More than sixty days has passed since the First and Second Notice Letters were served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has

commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33 U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

6.      Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.    INTRODUCTION

7.      This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 8787 Olive Lane, Santee, California, 92071 ("Compucraft Facility" or "Site"). Specifically, Defendant discharges storm water runoff from the Site into storm drains, Forester Creek, San Diego River, and ultimately the Pacific Ocean in Ocean Beach (collectively referred to as the "Receiving Waters"). This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as amended by Order No. 97-03-DWQ)* ("Industrial Permit"). This complaint further seeks relief to prevent discharges in violation of the Industrial Permit as amended by *Order No. 2014-0057-DWQ*. These are ongoing and continuous violations of the Clean Water Act and the Industrial Permit.

8.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Compucraft Facility, flow into City of Santee storm drain systems, Forester Creek, San Diego River and ultimately the Pacific Ocean. This discharge of pollutants in storm water from industrial activities such as the Compucraft Facility contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

III.    **PARTIES**

A.    **Coastal Environmental Rights Foundation**

9.      Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

10.      CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

11.      CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

12.      Plaintiff has thousands of members who live and/or recreate in and around Forester Creek, San Diego River, and the Pacific Ocean.

13.      Plaintiff's members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife, and engage in scientific study including monitoring activities, among other activities. Defendant discharges pollutants from the Sites to the Receiving Waters used by Plaintiff's members. Thus, Defendant's discharge of pollutants impairs Plaintiff's members' uses and enjoyment of the Receiving Waters.

14.      The interests of Plaintiff's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Industrial Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff's members, for which harm they have no plain, speedy or adequate remedy at law.

B.    **The Compucraft Facility Owners and/or Operators**

15.      Plaintiff is informed and believes that Compucraft Industries, Inc. is a private corporation organized under the laws of the State of California, and is located in

Santee, California.

16.     Plaintiff is informed and believes, and thereon alleges that Defendant Compucraft is current owner and operator of the property located at 8787 Olive Lane, Santee, California ("Property").

17.     Plaintiff is informed and believes, and thereon alleges Compucraft has owned and operated the Compucraft Facility since at least March 7, 2012.

## IV.   STATUTORY BACKGROUND

### A.   The Clean Water Act

18.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

19.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

20.     Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

21.     The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. (33 U.S.C. § 1342).

22.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a

5

standard or limitation." (33 U.S.C. § 1365(a)(1)).

23.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

24.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring after January 27, 2009. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

25.    Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

**B.    California's Industrial Permit**

26.    The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ  and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ, became effective July 1, 2015 ("New Industrial Permit").

27.    Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

28.    Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

29.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

30.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

31.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

32.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

33.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1).

34.     To ensure its effectiveness, the SWPPP must be evaluated on an annual

basis, and it must be revised as necessary to ensure compliance with the Permit. (Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA. And X.B.1.).

35.      Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

36.      The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial Permit, Section A(4); New Industrial Permit, Section X.E.).

37.      Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

38.      The objective of the M&RP is to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

39.      The Industrial Permit and New Industrial Permit require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

40.      The Industrial Permit and New Industrial Permit require dischargers to visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

41.      Both the Industrial Permit and New Industrial Permit require dischargers

to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

42.     The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. (Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). (New Industrial Permit, Section XI.B.2.).

43.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

44.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

## V.     STATEMENT OF FACTS

### A.     Compucraft Facility

45.     Plaintiff is informed and believes, and thereon alleges the Compucraft Facility is an aircraft part fabrication facility. The Compucraft Facility belongs to Sector AB of the Industrial Permit and its standard industrial classification (SIC) code is 3728.

46.     Plaintiff is informed and believes, and thereon alleges Compucraft filed a Notice of Intent to enroll under the Industrial Permit on March 7, 2012. Plaintiff is further informed and believes, and thereon alleges Compucraft filed a Notice of Intent to enroll under the New Industrial Permit on May 21, 2015.

47.     Plaintiff is informed and believes, and thereon alleges the Compucraft Facility fabricates metal products.

48.     Plaintiff is informed and believes, and thereon alleges various materials

comprised of ferrous and non-ferrous materials, as well as open drums, machinery, rusting equipment, rusting metal objects, uncovered trash bins, sediment, and steel shavings are stored onsite, outside and exposed to rainfall.

49.     Plaintiff is informed and believes, and thereon alleges particulates from operations, oil, grease, bacteria, suspended solids, plastics, and metals such as aluminum, copper, lead, iron and zinc materials are exposed to storm water at the Compucraft Facility.

50.     Plaintiff is informed and believes, and thereon alleges that storm water is conveyed to the south and southeast portion of the Site, where it flows into City storm drains.

51.     The Compucraft Facility discharges into storm drains that discharge into Forester Creek, downstream to the San Diego River, and ultimately the Pacific Ocean.

52.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (S*ee* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

53.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

54.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the

reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

55.     Information available to Plaintiff indicates that each of the surface waters into which the Compucraft Facility discharges polluted storm water are tributaries to traditional navigable waters, such as Forester Creek, San Diego River and the Pacific Ocean.

56.     Plaintiff is informed and believes, and thereon alleges the Compucraft Facility's polluted discharges cause and/or contribute to the impairment of water quality in Forester Creek and San Diego River. Forester Creek is on the 303(d) list as impaired for numerous constituents, including fecal coliform, selenium, total dissolved solids, and pH. The San Diego River is also impaired for numerous constituents, including dissolved oxygen, manganese, bacteria, nitrate and nitrite nitrogen, phosphorous, total dissolved solids, and toxicity.

57.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters.  Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

58.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38 , ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limit for zinc is .12 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

59.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP), 2015, Factsheet p. 55). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are

successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id*., at p. 65).

60.     EPA has established the following benchmark values in the MSGP: aluminum 0.75 mg/L; iron: 1.0 mg/L; zinc (freshwater)[1] – 0.04-.26 mg/L; and nitrate plus nitrite nitrogen: .68 mg/L. (MSGP, Factsheet p. 55).

61.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for Forester Creek and San Diego River. (Basin Plan, Table 2-2).

**B.     Past and Present Industrial Activity at the Compucraft Facility**

62.     Plaintiff is informed, believes, and thereon alleges that the Defendant engages in manufacturing aerospace products using raw material steels and ferrous alloys.

63.     The potential pollutant sources associated with the industrial activities at the Compucraft Facility include, but are not limited to: the metal outdoor storage areas; outdoor machinery; parking areas; shipping and receiving areas; loading and unloading areas; maintenance areas; piles of steel cuttings; and the on-site material handling equipment.

64.     The EPA Industrial Stormwater Factsheet for Sector AB identifies numerous common pollutants associated with facilities such as the Compucraft Facility. A true and correct copy of this Factsheet is attached hereto as Exhibit C.

65.     Plaintiff is informed, believes, and thereon alleges that pollutants present in storm water discharged from the Compucraft Facility therefore include but are not

---

[1] The zinc benchmark is dependent on water hardness.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

limited to: toxic metals such as copper, iron, zinc, lead, nickel, magnesium and aluminum; petroleum products including oil, fuel, and grease; chemical admixtures, acids and solvents; total suspended solids and pH-affecting substances; phosphorous; and fugitive and other dust, dirt and debris.

66.     Based upon Plaintiff's investigation, Plaintiff is informed, believes, and thereon alleges Defendant stores metal and other materials outside where it is exposed to storm water.

67.      Plaintiff is informed, believes, and thereon alleges that there are drums and other containers stored on-Site that are uncovered and/or uncontained.

68.     Plaintiff is informed, believes, and thereon alleges that polluted storm water flows offsite from the Compucraft Facility into Santee storm drains and Forester Creek.

69.     Plaintiff is informed, believes, and thereon alleges that the Compucraft Facility lacks effective BMPs to control the flow of storm water from the Facility into the City of Santee and Forester Creek drainage channels. As a result, suspended solids, metal particles, and other pollutants have been and continue to be conveyed from the Compucraft Facility into Forester Creek and San Diego River drainage channels.

70.     As a result, Plaintiff is informed, believes, and thereon alleges that during rain events, storm water carries pollutants from the Compucraft Facility outdoor storage areas, bins and dumpsters, floor contaminants, equipment, uncontained metal drums, and other sources directly into the storm drains and Forester Creek and San Diego River drainage channels.

71.     Plaintiff is informed, believes, and thereon alleges that the Compucraft Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the Compucraft Facility.

   **C.   The Compucraft Facility and its Associated Discharge of Pollutants**

72.     Plaintiff is informed, believes, and thereon alleges that with every significant rain event, the Compucraft Facility discharges polluted storm water from the

13

industrial activities at the facility via the City of Santee's storm drain system and into the Receiving Waters.

73.     Plaintiff is informed, believes, and thereon alleges that the Receiving Waters into which the Compucraft Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit and New Industrial Permit properly regulate discharges to those waters.

74.     Surface waters that cannot support their Beneficial Uses listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies, Forester Creek is impaired for fecal coliform, selenium, total dissolved solids, and pH.

75.     The San Diego River is also impaired for numerous constituents, including dissolved oxygen, manganese, bacteria, nitrate and nitrite nitrogen, phosphorous, total dissolved solids, and toxicity.

76.     Because discharges from the Compucraft Facility contain particulates and metals, the Compucraft Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

77.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the Compucraft Facility has exceeded the CTR Water Quality Standards applicable to zinc in California.

78.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the Compucraft Facility has also exceeded the EPA Benchmark values and New Industrial Permit Numeric Action Levels for aluminum, iron and Total Suspended Solids.

79.     Plaintiff's Compucraft Facility water monitoring samples indicate exceedances as high as ten times applicable water quality standards.

80.     Plaintiff is informed, believes, and thereon alleges that during every significant rain event that has occurred at the Compucraft Facility since March 7, 2012 through the present, Defendant has discharged and continues to discharge storm water

from the Compucraft Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

81.    Plaintiff is informed, believes, and thereon alleges, from visual observations, sample results, and investigations available to Plaintiff, Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Compucraft Facility. The inadequacy of the BMPs at the Compucraft Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for this Site. Therefore, storm water discharges from the Compucraft Facility contain pollutant concentration levels that are above EPA Benchmarks, Numeric Action Levels and applicable Water Quality Standards.

82.    Plaintiff is informed, believes, and thereon alleges that since at least March 7, 2012 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the Compucraft Facility in violation of Effluent Limitation B(3) of the Industrial Permit. Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

83.    Based on its investigation of the Compucraft Facility, Plaintiff is informed, believes, and thereon alleges Defendant has failed to develop and implement an adequate SWPPP since at least March 7, 2012 through the present. Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

84.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed to submit written reports to the Regional Board identifying BMPs necessary to achieve BAT/BCT at the Compucraft Facility since at least March 7, 2012, in violation of Receiving Water Limitations C(3) and C(4) of the Industrial Permit and New Industrial Permit Receiving Water Limitation VI.A. Each day that Defendant has

operated the Compucraft Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

85.     Plaintiff is informed, believes, and thereon alleges that Defendant has not developed or implemented a monitoring, reporting and sampling program for the Compucraft Facility. Plaintiff is informed, believes, and thereon alleges that Defendant has not sampled its storm water discharges or conducted visual monitoring as required since at least March 7, 2012.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

86.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

87.     Plaintiff is informed, believes, and thereon alleges that as a result of the operations at the Compucraft Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the Compucraft Facility to the Receiving Waters.

88.     Plaintiff is informed, believes, and thereon alleges that Defendant's discharges of contaminated storm water have caused and continue to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Discharge Prohibition A(2) of the Industrial Permit and Section VI.C of the New Industrial Permit.

89.     Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have adversely affected, and continue to adversely affect, human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Permit and Section VI.B. of the New Industrial Permit.

90.     Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have caused or contributed to and continue to cause or

Complaint for Declaratory and Injunctive Relief and Civil Penalties

contribute to an exceedance of Water Quality Standards in violation of Receiving Water Limitation C(2) of the Industrial Permit and VI.A. of the New Industrial Permit.

91. Plaintiff is informed, believes, and thereon alleges that from at least March 7, 2012 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from the Compucraft Facility to Receiving Waters in violation of the prohibitions of the Industrial Permit. Thus, Defendant is liable for civil penalties for at 1,825 violations of the Industrial Permit and the CWA.

92. Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the Industrial Permit and the CWA are ongoing.

93. Defendant will continue to be in violation of the Industrial Permit requirements each day the Compucraft Facility discharges contaminated storm water in violation of Industrial Permit prohibitions.

94. Every day that Defendant has discharged and/or continues to discharge polluted storm water from the Compucraft Facility in violation of the Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

95. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 7, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

96. An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

/././

/././

/././

## SECOND CAUSE OF ACTION

**Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology In Violation of the Industrial Permit and the Clean Water Act (Violations of 33 U.S.C. §§1311, 1342)**

97.     Plaintiff incorporated the preceding paragraphs as if fully set forth herein.

98.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

99.     Sampling of the Compucraft Facility's storm water discharges as well as Plaintiff's observations and local agency inspections of the Compucraft Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations of the Industrial Permit and New Industrial Permit.

100.    Plaintiff is informed, believes, and thereon alleges that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA every day since at least March 7, 2012, and of the BAT/BCT requirements of the New Industrial Permit since July 1, 2015.

101.    Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the Effluent Limitations and the CWA are ongoing.

102.    Defendant will continue to be in violation every day the Compucraft Facility operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the Compucraft Facility.

103.    Every day that Defendant operates the Compucraft Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Industrial Permit or New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

104.    By committing the acts and omissions alleged above, Defendant is subject

18

to an assessment of civil penalties for each and every violation of the CWA occurring from March 7, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

105.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## THIRD CAUSE OF ACTION
### Failure to Develop and/or Implement an Adequate
### Storm Water Pollution Prevention Plan
### in Violation of the Industrial Permit and Clean Water Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

106.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

107.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate SWPPP for the Compucraft Facility that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X of the New Industrial Permit.

108.    Defendant has been in violation of the SWPPP requirements every day since at least March 7, 2012.

109.    Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

110.    Defendant will continue to be in violation of the SWPPP requirements every day the Compucraft Facility operates with an inadequately developed and/or implemented SWPPP for the Compucraft Facility.

111.    Each day that Defendant operates the Compucraft Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a).

112.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 7, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

113.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
### Failure to Conduct Required Rain Event Sampling in
### Violation of the Industrial Permit

114.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

115.    Plaintiff is informed, believe, and thereon allege that Defendant is in violation of Industrial Permit Section B(7) and B(5) by failing to collect at least two samples of storm water runoff, including one set of samples during the first storm event of the wet season.

116.    Plaintiff is informed, believes, and thereon alleges that Defendant failed to collect two samples during every wet season since March 7, 2012.

117.    Information available to Plaintiff indicates that there were numerous qualifying rain events during the 2011, 2012, 2013, 2014, and 2015 wet seasons.

118.    Defendant has further failed to monitor for constituents likely to be associated with industrial activity at the Compucraft Facility for which the Receiving Waters, namely Forester Creek and San Diego River, are impaired.

119.    Defendant has been in violation of the Industrial Permit and the CWA for each day the Compucraft Facility operates without sampling as required by the Industrial Permit and New Industrial Permit.

120.    By committing the acts and omissions alleged above, Defendant is subject

Complaint for Declaratory and Injunctive Relief and Civil Penalties

to an assessment of civil penalties for each and every violation of the CWA occurring from March 7, 2012 to the presents, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

121.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a).  Continuing commission of the omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

122.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendant to have violated and to be in violation of the Clean Water Act for its unlawful discharges of pollutants from the Compucraft Facility (1) without an NPDES permit, and (2) in violation of the substantive and procedural requirements of the Industrial Permit, and as of July 1, 2015, the New Industrial Permit;

b.   A Court order enjoining Defendant from discharging pollutants from the Compucraft Facility without an NPDES permit;

c.   A Court order enjoining Defendant from violating the Clean Water Act and substantive and procedural requirements of the New Industrial Permit;

d.   A Court order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at the Compucraft Facility occurring since March 7, 2012, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.   A Court order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

f.   A Court order awarding Plaintiff its reasonable costs of suit, including

attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

       g.    Any other relief as this Court may deem appropriate.

Dated: June 21, 2016              Respectfully submitted,

COAST LAW GROUP LLP

By: s/Livia Borak
LIVIA BORAK
MARCO A. GONZALEZ
Attorneys for Plaintiff
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

Complaint for Declaratory and Injunctive Relief and Civil Penalties

# TABLE OF CONTENTS

**Exhibit A: Page 1**

**Exhibit B: Page 6**

**Exhibit C: Page 13**



1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax 760-942-8515
www.coastlawgroup.com

**August 21, 2015**

Margarita Brear                              <u>**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**</u>
Agent for Service of Process
Compucraft Industries, Inc
8787 Olive Lane
Santee CA 92071

> **Re:    Clean Water Act Notice of Intent to Sue/60-Day Notice Letter**
> **Compucraft Violations of General Industrial Permit**

Dear Ms. Brear:

Please accept this letter on behalf of the Coastal Environmental Rights Foundation (CERF) regarding Compucraft Industries, Inc's violations of the State Water Resources Control Board Water Quality Order No. 97-03-DWQ, Natural Pollutant Discharge Elimination System (NPDES), General Permit No. CAS000001, and Waste Discharge Requirements for Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities (General Industrial Permit). This letter constitutes CERF's notice of intent to sue for  violations of the Clean Water Act and General Industrial Permit for Compucraft Industries, Inc, located at 8787 Olive Lane, Santee, CA ("Facility" or "Compucraft"), as set forth in more detail below.

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under Section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency for the region in which the violations have occurred, the U.S. Attorney General, and the Chief Administrative Officer for the State in which the violations have occurred (33 U.S.C. § 1365(b)(1)(A)). This letter provides notice of Compucraft's Clean Water Act violations and CERF's intent to sue.

## I.    Coastal Environmental Rights Foundation (CERF)

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. Members of CERF use and enjoy the waters into which pollutants from Compucraft's ongoing illegal activities are discharged into the San Diego River and Forester Creek, and eventually the Pacific Ocean. The public and members of CERF use the San Diego River and Forester Creek to fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the Compucraft Facility affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by Compucraft Owners and/or Operators' failure to comply with the Clean Water Act and the General Industrial Permit.

**EXHIBIT A Page 1**

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**August 21, 2015**
**Page 2**

---

II.    <u>**Storm Water Pollution and the General Industrial Permit**</u>

      A.    **Duty to Comply**

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311 (a)). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the General Industrial Permit in order to lawfully discharge. Compucraft enrolled as a discharger subject to the General Industrial Permit on March 7, 2012 for its facility at 8787 Olive Lane in Santee, California (WDID No. 9 37I023545).

Pursuant to Section C(1) of the General Industrial Permit, a facility operator must comply with all conditions of the General Industrial Permit. <u>Failure to comply with the General Industrial Permit is a Clean Water Act violation.</u> (General Industrial Permit, § C.1). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) General Industrial Permit termination, revocation and re-issuance, or modification; or (c) denial of a General Industrial Permit renewal application.  As an enrollee, Compucraft has a duty to comply with the General Industrial Permit and is subject to all of the provisions therein.

      B.    **Failure to File An Annual Report**

Section B(14) requires that all facility operators submit an Annual Report by July 1 of each year to the Executive Officer of the Regional Water Board responsible for the area in which the facility is located. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report, an explanation of why a facility did not implement any activities required, and records specified in Section B(13) and B(14) of the General Industrial Permit. The Annual Report is necessary in order to assess the facility's compliance and prevent excess discharges from the facility into receiving waters (San Diego River and Forester Creek).

Every day the Compucraft Owners and/or Operators operate the Facility without reporting, as required by the General Industrial Permit, is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Compucraft Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit's reporting requirements every day they fail to submit reports to the Regional Board. The Compucraft Owners and/or Operators are subject to penalties for all violations of the General Industrial Permit and the Clean Water Act occurring since they failed to timely submit an annual report, beginning July 1, 2014. The 2013-2014 and 2014-2015 Annual Reports are still outstanding.

Thus, the Compucraft Owners and/or Operators are liable for civil penalties and violations of the reporting requirements of the General Industrial Permit and the Clean Water Act, punishable by a minimum of $37,500 per day of violation. (33 U.S.C. §1319(d); 40 CFR 19.4).

**Notice of Intent to Sue: Clean Water Act**
***Compucraft***
**August 21, 2015**
**Page 3**

### C.     Failure to Monitor

The Compucraft Owners and/or Operators have further failed to sample as required for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 years. Sections B(5) and (7) of the General Industrial Permit require dischargers to visually observe and collect samples of storm water discharged from all locations where storm water is discharged. Facility operators, including the Compucraft Owners and/or Operators, are required to collect samples from at least two qualifying storm events each wet season, including one set of samples during the first storm event of the wet season. Required samples must be collected by Facility operators from all discharge points and during the first hour of the storm water discharge from the Facility. Sampling of stored or contained storm water shall occur any time the stored or contained storm water is released.

The Compucraft Owners and/or Operators have completely failed to meet these monitoring requirements for the 2011-2012, 2012-2013, 2013-2014 and 2014-2015 periods, despite the fact that there were numerous qualifying rain events during these wet seasons.

In fact, many of Compucraft's neighbors were able to monitor during these wet seasons. Advance Electromagnetics, located at 9311 Stevens Road in Santee, was able to sample on May 6, 2013 and March 3, 2014. In addition, Valley Box Company, Inc, located at 16011 Prospect Avenue, Santee, was able to sample twice during the 2012-2013 wet season, on December 13, 2012 and December 18, 2012. Valley Box Company, Inc also sampled on February 28, 2014.

RCP Block and Brick, Inc, located at 9631 Magnolia, Santee, and Artistic Marble & Granite, Inc, located at 9323 Stevens Road, Santee were likewise able to sample on December 13, 2012. Artistic Marble & Granite, Inc also sampled on January 25, 2013, December 19, 2013, and February 3, 2014.

The Compucraft Owners and/or Operators therefore had numerous opportunities to sample but failed to do so. They are thus subject to penalties in accordance with the General Industrial Permit – punishable by a minimum of $37,500 per day of violation. (33 U.S.C. §1319(d); 40 CFR 19.4).

### D.     Inadequate Storm Water Pollution Prevention Plan

One of the main requirements for the General Industrial Permit is the Storm Water Pollution Prevention Plan (SWPPP). (General Industrial Permit §A).  Compucraft has not developed an adequate SWPPP as required by the General Permit.

The SWPPP has two major objectives: (1) to help identify the sources of pollution that affect the quality of industrial storm water discharges and authorized non-storm water discharges, and (2) to describe and ensure the implementation of BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized non-storm water discharges. (General Industrial Permit, Fact Sheet, p. IX).

The Compucraft SWPPP fails to identify Forester Creek or the San Diego River on its Facility map as required by section A.4.a, or the location of the storm water collection or conveyance system as required pursuant to section A.4.b.

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**August 21, 2015**
**Page 4**

---

The SWPPP also fails to incorporate the New Industrial Permit monitoring requirements[1]. (New Industrial Permit, Section XI.B.2.). Further, the Facility discharges to a 303(d) listed water body, which requires additional evaluation under the New Industrial Permit for multiple constituents which are likely to be associated with industrial storm water. Thus, the SWPPP fails to evaluate the Facility's potential contribution of pollutants for which Forester Creek is listed. (New Industrial Permit, §X.G.2.a.ix; XI.B.6.e.).

Every day the Compucraft Owners and/or Operators operate the Facility without an adequate SWPPP, there is a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Compucraft Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit for not submitting an adequate SWPPP since enrollment. These violations are ongoing and the Compucraft Owners  and/or Operators will continue to be in violation every day they fail provide a SWPPP for the Facility. Thus, the Compucraft Owners and/or Operators are liable for civil penalties of up to $37,500 per day of violation of the General Industrial Permit and the Clean Water Act.

### III.    Remedies

Upon expiration of the 60-day period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced violations. During the 60-day notice period, however, CERF is willing to discuss effective remedies for the violation noted in this letter. If you wish to pursue such discussions in the absence of litigation, it is suggested that you initiate those discussions immediately. If good faith negotiations are not being made, at the close of the 60-day notice period, CERF will move forward expeditiously with litigation.

Compucraft must develop and implement an updated SWPPP and implement a robust monitoring plan. Should the Compucraft Owners and/or Operators fail to do so, CERF will file an action against Compucraft for its prior, current, and anticipated violations of the Clean Water Act. CERF's action will seek all remedies available under the Clean Water Act § 1365(a)(d). CERF will seek the maximum penalty available under the law which is $37,500 per day.

CERF may further seek a court order to prevent Compucraft from discharging pollutants. A strong or substantial likelihood of success on the merits of CERF's claim exists, and irreparable injuries to the public, public trust resources, and the environments will result if the Facility further discharges pollutants into Forester Creek. The cessation of the Facility's discharge will not cause substantial harm to others, and the public interest would be served in preventing discharge of pollutants into receiving waters.

Lastly, section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

---

[1]  On April 1, 2014, the State Water Resources Control Board adopted Order No. 2014-0057-DWQ, which amends the Industrial General Permit ("New Industrial Permit"). These amendments become effective on July 1, 2015. All references to the General Industrial Permit are to the Permit as it existed at the time of the violations noted herein.

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**August 21, 2015**
**Page 5**

### IV.     Conclusion

CERF has retained legal counsel to represent it in this matter. Please direct all communications to Coast Law Group:

> **Marco A. Gonzalez**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**

CERF will entertain settlement discussions during the 60-day notice period. Should you wish to pursue settlement, please contact Coast Law Group LLP at your earliest convenience.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak**
Attorneys for
Coastal Environmental Rights Foundation

cc:

| | |
|---|---|
| Jared Blumenfeld, Region 9 Administrator<br>Alexis Strauss, Deputy Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA, 94105 | Dave Gibson, Executive Officer<br>Catherine Hagan, Staff Counsel<br>San Diego Regional Water Quality Control Board<br>2375 Northside Drive, Suite 100<br>San Diego, CA 92108-2700 |
| Gina McCarthy<br>EPA Administrator<br>Mail Code 4101M<br>USEP A Ariel Rios Building (AR)<br>1200 Pennsylvania Avenue N.W.<br>Washington, DC 20004 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, CA 95812-0110 |



1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax  760-942-8515
www.coastlawgroup.com

**April 14, 2016**

Margarita Brear                    **VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
Agent for Service of Process
Compucraft Industries, Inc
8787 Olive Lane
Santee CA 92071

> **Re:**   **Second Clean Water Act Notice of Intent to Sue/60-Day Notice Letter
> Compucraft Violations of General Industrial Permit**

Dear Ms. Brear:

Please accept this letter on behalf of the Coastal Environmental Rights Foundation (CERF) regarding Compucraft Industries, Inc's violations of the State Water Resources Control Board Water Quality Order No. 97-03-DWQ, Natural Pollutant Discharge Elimination System (NPDES), General Permit No. CAS000001, and Waste Discharge Requirements for Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities (General Industrial Permit).[1] This letter constitutes CERF's notice of intent to sue for violations of the Clean Water Act and General Industrial Permit for Compucraft Industries, Inc, located at 8787 Olive Lane, Santee, CA ("Facility" or "Compucraft"), as set forth in more detail below.

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under Section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency for the region in which the violations have occurred, the U.S. Attorney General, and the Chief Administrative Officer for the State in which the violations have occurred (33 U.S.C. § 1365(b)(1)(A)). This letter provides notice of Compucraft's Clean Water Act violations and CERF's intent to sue.

**I.**     **Coastal Environmental Rights Foundation (CERF)**

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. Members of CERF use and enjoy the waters into which pollutants from Compucraft's ongoing illegal activities are discharged into the San Diego River and Forester Creek, and eventually the Pacific Ocean. The public and members of CERF use the San Diego River and Forester Creek to fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the Compucraft Facility affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by Compucraft Owners and/or Operators' failure to comply with the Clean Water Act and the General

---

[1] On April 1, 2014, the State Water Resources Control Board adopted Order No. 2014-0057-DWQ, which amends the Industrial General Permit ("New Industrial Permit"). These amendments became effective on July 1, 2015. All references to the General Industrial Permit are to the Permit as it existed at the time of the violations noted herein.

Industrial Permit.

### II. Storm Water Pollution and the General Industrial Permit

#### A. Duty to Comply

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311 (a)). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the General Industrial Permit in order to lawfully discharge. Compucraft enrolled as a discharger subject to the General Industrial Permit on March 7, 2012 for its facility at 8787 Olive Lane in Santee, California (WDID No. 9 37I023545). Compucraft enrolled under the New Industrial Permit on May 21, 2015.

Pursuant to Section C(1) of the General Industrial Permit, a facility operator must comply with all conditions of the General Industrial Permit. (See New Industrial Permit, §I.A.8. [dischargers must "comply with all requirements, provisions, limitations, and prohibitions in this General Permit."]). Failure to comply with the General Industrial Permit is a Clean Water Act violation. (General Industrial Permit, § C.1). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) General Industrial Permit termination, revocation and re-issuance, or modification; or (c) denial of a General Industrial Permit renewal application. As an enrollee, Compucraft has a duty to comply with the General Industrial Permit and is subject to all of the provisions therein.

#### B. The Compucraft Facility Discharges Contaminated Storm Water in Violation of the General Industrial Permit

Since the Compucraft Owners and/or Operators began monitoring the Facility's discharges, this data has consistently indicated exceedances and violations of the New Industrial Permit. New Industrial Permit Sections III.C-D prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

New Industrial Permit Receiving Water Limitations VI.A-C prohibit storm water discharges to surface or groundwater that adversely impact human health or the environment, and prohibit storm water discharges and authorized non-storm water discharges, which cause or contribute to an exceedance of any water quality standards or applicable Basin Plan water quality standards.

The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard. (*Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 926). "In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' such a standard, including the CTR." (*Id.* at 927).

If a discharger violates Water Quality Standards, the New Industrial Permit and the Clean Water Act require that the discharger implement more stringent controls necessary to meet such Water Quality Standards.(General Industrial Permit, Fact Sheet p. viii; 33 U.S.C. § 1311(b)(I)(C)). The Compucraft Owners and/or Operators have failed to comply with this requirement, routinely violating Water Quality Standards without implementing BMPs to achieve BAT/BCT or revising the Facility's SWPPP pursuant to General Industrial Permit section (C)(3) and New Industrial Permit Section X.B.1.

As demonstrated by sample data submitted by Compucraft, from enrollment on March 7,

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**April 14, 2016**
**Page 3**

2012 through the present, the Compucraft Owners and/or Operators have discharged and continue to discharge storm water containing pollutants at levels in violation of water quality prohibitions and limitations during every significant rain event. The Compucraft Facility's sampling data reflects numerous discharge violations (see below). Compucraft's own sampling data is not subject to impeachment. (*Baykeeper, supra*, 619 F.Supp. 2d at 927, citing *Sierra Club v. Union Oil Co. of Cal.*, (9th Cir. 1987) 813 F.2d 1480, 1492 ["when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"]).

This data further demonstrates the Compucraft Facility continuously discharges contaminated storm water during rain events which have not been sampled, including those noted in CERF's Notice Letter dated August 21, 2015.

| No. | Date | Discharge Point | Parameter | Units | Result | Benchmark/WQO |
|-----|------|-----------------|-----------|-------|--------|---------------|
| 1 | 9-15-2015 | 1-SE | Aluminum | mg/L | 1.57 | .75 |
| 2 | 9-15-2015 | 1-SE | Iron | mg/L | 1.68 | 1.0 |
| 3 | 9-15-2015 | 1-SE | Zinc | mg/L | 1.60 | .12 |
| 4 | 9-15-2015 | 1-SE | TSS | mg/L | 176 | 100 |
| 5 | 9-15-2015 | 2-NW | Aluminum | mg/L | 2.86 | .75 |
| 6 | 9-15-2015 | 2-NW | Iron | mg/L | 2.44 | 1.0 |
| 7 | 9-15-2015 | 2-NW | Zinc | mg/L | .553 | .12 |
| 8 | 9-15-2015 | 2-NW | TSS | mg/L | 123 | 100 |
| 9 | 12-22-2015 | 1-SE | Aluminum | mg/L | 1.23 | .75 |
| 10 | 12-22-2015 | 1-SE | Iron | mg/L | 1.69 | 1.0 |
| 11 | 12-22-2015 | 1-SE | Zinc | mg/L | 1.02 | .12 |
| 12 | 12-22-2015 | 2-NW | Aluminum | mg/L | 1.57 | .75 |
| 13 | 12-22-2015 | 2-NW | Iron | mg/L | 1.61 | 1.0 |
| 14 | 12-22-2015 | 2-NW | Zinc | mg/L | .125 | .12 |
| 15 | 1-5-2016 | 1-SE | Aluminum | mg/L | 1.28 | .75 |
| 16 | 1-5-2016 | 1-SE | Iron | mg/L | 1.40 | 1.0 |
| 17 | 1-5-2016 | 1-SE | Zinc | mg/L | .138 | .12 |
| 18 | 1-5-2016 | 2-NW | Aluminum | mg/L | 1.99 | .75 |
| 19 | 1-5-2016 | 2-NW | Iron | mg/L | 2.39 | 1.0 |
| 20 | 1-5-2016 | 2-NW | Zinc | mg/L | 1.18 | .12 |

Every day the Compucraft Facility discharged or continues to discharge polluted storm water in violation of the Discharge Prohibitions and Receiving Water Limitations of the General Industrial Permit or New Industrial Permit is a separate and distinct violation of the Permit(s) and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).The Compucraft Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 7, 2012. These violations are ongoing and will continue each day contaminated storm water is discharged in violation of the requirements of the General Industrial Permit and New Industrial Permit. CERF will include additional violations when information becomes available.

D.      **Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology**

Effluent Limitation (B)(3) of the General Industrial Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of the Best Available Technology Economically Achievable (BAT) for toxic pollutants[2] and Best Conventional Pollutant Control Technology (BCT) for conventional pollutants.[3] Likewise, the New Industrial Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." (New Industrial Permit, §I.D.32; see also, §V.A.).

EPA Benchmarks and New Industrial Permit Numeric Action Levels (NALs) are the pollutant concentrations which generally indicate whether a facility has successfully developed or implemented BMPs that meet the BAT/BCT.

Compucraft has consistently failed to comply with the following EPA benchmarks:

| Parameter | Benchmark[4] (mg/L) |
|---|---|
| Total Aluminum | .75 |
| Total Iron | 1.0 |
| Total Zinc | .12 (Hardness Dependent) |

The State Water Resources Control Board has also set Numeric Action Levels[5] for numerous consituents, including the following:

| Parameter | NAL |
|---|---|
| TSS (mg/L) | 100 |

Compucraft has consistently exceeded this NAL. Discharges with pollutant concentration levels above EPA Benchmarks and/or the CTR demonstrate that a facility has failed to develop and/or implement BMPs that achieve compliance with BAT for toxic pollutants and BCT for conventional pollutants. The Compucraft Facility monitoring data demonstrates consistent exceedances of not only the CTR, but also EPA benchmarks and NALs. (See monitoring data above).

---

[2] Toxic pollutants are found at 40 CFR § 401.15 and include, but are not limited to: lead, nickel, zinc, silver, selenium, copper, and chromium.

[3] Conventional pollutants are listed at 40 CFR  § 401.16 and include biological oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

[4] See 2015 Multi-Sector General Permit Fact Sheet, pages 55-56

[5] See New Industrial Permit, Table 2

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**April 14, 2016**
**Page 5**

Thus, Compucraft's storm water discharge sampling data demonstrates the Facility has not developed and/or implemented BMPs that meet the standards of BAT/BCT. (See *Baykeeper, supra*, 619 F.Supp. 2d at 925 ["Repeated and/or significant exceedances of the Benchmark limitations should be relevant" to the determination of meeting BAT/BCT]).

Observations by City of Santee stormwater consultants confirm these violations. As a result of her November 14, 2012 inspection, a City of Santee stormwater inspector noted multiple failures to implement BMPs. The inspector noted lids were open, bins needed lids, and the Facility needed sweeping and cleaning.

As a result, the Compucraft Owners and/or Operators are in violation of Effluent Limitation (B)(3) of the General Industrial Permit and Section V.A. of the New Industrial Permit. Every day the Compucraft Owners and/or Operators operate with inadequately developed and/or implemented BMPs in violation of the BAT/BCT requirements is a separate and distinct violation of the Permits and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311 (a)). Therefore, the Compucraft Owners and/or Operators have been in daily and continuous violation of the BAT/BCT requirements of the General Industrial Permit every day since at March 7, 2012, and are subject to penalties for all such violations. The Compucraft Owners and/or Operators are liable for civil penalties for 1,499 violations of the General Industrial Permit and the Clean Water Act.

These violations are ongoing and the Compucraft Owners and/or Operators will continue to be in violation every day they fail to develop and/or implement BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the Compucraft Facility.

### D.      Inadequate Storm Water Pollution Prevention Plan

One of the main requirements for the General Industrial Permit is the Storm Water Pollution Prevention Plan (SWPPP). (General Industrial Permit §A; New Industrial Permit §X.). Compucraft has not developed an adequate SWPPP as required by the General Permit or New Industrial Permit. (New Industrial Permit, §X.A.1-10).

The latest Compucraft SWPPP, uploaded to SMARTS on May 22, 2015, fails to account for the numerous and repeated violations identified by Compucraft's monitoring data – ensuring these violations continue. The SWPPP is therefore inadequate. (See New Industrial Permit §I.E.37. ["Compliance with water quality standards may, in some cases, require Dischargers to implement controls that are more protective than controls implemented solely to comply with the technology-based requirements in this General Permit."]). If a discharger determines industrial discharges contain pollutants in violation of Receiving Water Limitations (Section VI), the discharger is required to assess the BMPs in the SWPPP and determine whether additional measures and a revised SWPPP are necessary. (New Industrial Permit, §XX.B.1). Compucraft has clearly failed to comply with these requirements.

Every day the Compucraft Owners and/or Operators operate the Facility without an adequate SWPPP constitutes a separate and distinct violation of the General Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Compucraft Owners and/or Operators have been in daily and continuous violation of the General Industrial Permit for not submitting an adequate SWPPP since enrollment. These violations are ongoing and the Compucraft Owners and/or Operators will continue to be in violation every day they fail to provide an adequate SWPPP for the Facility. Thus, the Compucraft Owners and/or Operators are liable for civil penalties of up to $37,500 per day of violation of the General Industrial Permit and the Clean Water Act.

Notice of Intent to Sue: Clean Water Act
*Compucraft*
April 14, 2016
Page 6

_____

III.      Remedies

Upon expiration of the 60-day period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced violations. During the 60-day notice period, however, CERF is willing to discuss effective remedies for the violation noted in this letter. If you wish to pursue such discussions in the absence of litigation, it is suggested that you initiate those discussions immediately. If good faith negotiations are not being made, at the close of the 60-day notice period, CERF will move forward expeditiously with litigation.

Compucraft must develop and implement an updated SWPPP and address its numerous water quality violations, including its CTR and EPA benchmark exceedances. Should the Compucraft Owners and/or Operators fail to do so, CERF will file an action against Compucraft for its prior, current, and anticipated violations of the Clean Water Act. CERF's action will seek all remedies available under the Clean Water Act § 1365(a)(d). CERF will seek the maximum penalty available under the law which is $37,500 per day. CERF may further seek a court order to prevent Compucraft from discharging pollutants.

Lastly, section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

IV.      Conclusion

CERF has retained legal counsel to represent it in this matter. Please direct all communications to Coast Law Group:

> **Marco A. Gonzalez**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**

CERF will entertain settlement discussions during the 60-day notice period. Should you wish to pursue settlement, please contact Coast Law Group LLP at your earliest convenience.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak**
Attorneys for
Coastal Environmental Rights Foundation

cc:

**Notice of Intent to Sue: Clean Water Act**
*Compucraft*
**April 14, 2016**
**Page 7**

| | |
|---|---|
| Jared Blumenfeld, Region 9 Administrator<br>Alexis Strauss, Deputy Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA, 94105 | Dave Gibson, Executive Officer<br>Catherine Hagan, Staff Counsel<br>San Diego Regional Water Quality Control Board<br>2375 Northside Drive, Suite 100<br>San Diego, CA 92108-2700 |
| Gina McCarthy<br>EPA Administrator<br>Mail Code 4101M<br>USEP A Ariel Rios Building (AR)<br>1200 Pennsylvania Avenue N.W.<br>Washington, DC 20004 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, CA 95812–0110 |

# INDUSTRIAL STORMWATER

## FACT SHEET SERIES



*Sector AB: Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities*



U.S. EPA Office of Water
EPA-833-F-06-043
December 2006

## What is the NPDES stormwater permitting program for industrial activity?

Activities, such as material handling and storage, equipment maintenance and cleaning, industrial processing or other operations that occur at industrial facilities are often exposed to stormwater. The runoff from these areas may discharge pollutants directly into nearby waterbodies or indirectly via storm sewer systems, thereby degrading water quality.

In 1990, the U.S. Environmental Protection Agency (EPA) developed permitting regulations under the National Pollutant Discharge Elimination System (NPDES) to control stormwater discharges associated with eleven categories of industrial activity. As a result, NPDES permitting authorities, which may be either EPA or a state environmental agency, issue stormwater permits to control runoff from these industrial facilities.

## What types of industrial facilities are required to obtain permit coverage?

This fact sheet specifically discusses stormwater discharges from facilities that manufacture transportation equipment, industrial, or commercial machinery as described in SIC Major Groups 35 and 37 (except 357 and 373). This includes:

- Engines and turbines (SIC Code 351)
- Farm and garden machinery and equipment (SIC Code 352)
- Construction, mining, and materials handling machinery and equipment (SIC Code 353)
- Metalworking machinery and equipment (SIC Code 354)
- Special industry machinery, except metalworking machinery (SIC Code 355)
- General industrial machinery and equipment (SIC Code 356)
- Refrigeration and service industry machinery (SIC Code 358)
- Miscellaneous industrial and commercial machinery and equipment (SIC Code 359)
- Motor vehicles and motor vehicle equipment (SIC Code 371)
- Aircraft and parts (SIC Code 372)
- Motorcycles, bicycles, and parts (SIC Code 375)
- Guided missiles and space vehicles and parts (SIC Code 376)
- Miscellaneous transportation equipment (SIC Code 379)

## What does an industrial stormwater permit require?

Common requirements for coverage under an industrial stormwater permit include development of a written stormwater pollution prevention plan (SWPPP), implementation of control measures, and submittal of a request for permit coverage, usually referred to as the Notice of Intent or NOI.

INDUSTRIAL STORMWATER FACT SHEET SERIES

*Sector AB: Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities*

The SWPPP is a written assessment of potential sources of pollutants in stormwater runoff and control measures that will be implemented at your facility to minimize the discharge of these pollutants in runoff from the site. These control measures include site-specific best management practices (BMPs), maintenance plans, inspections, employee training, and reporting. The procedures detailed in the SWPPP must be implemented by the facility and updated as necessary, with a copy of the SWPPP kept on-site. The industrial stormwater permit also requires collection of visual, analytical, and/or compliance monitoring data to determine the effectiveness of implemented BMPs. For more information on EPA's industrial stormwater permit and links to State stormwater permits, go to **www.epa.gov/npdes/stormwater** and click on "Industrial Activity."

## What pollutants are associated with my facilities activities?

Pollutants conveyed in stormwater discharges from facilities involved with the manufacturing of transportation equipment, industrial, or commercial machinery will vary. There are a number of factors that influence to what extent industrial activities and significant materials can affect water quality.

- Geographic location
- Topography
- Hydrogeology
- Extent of impervious surfaces (e.g., concrete or asphalt)
- Type of ground cover
- Outdoor activities (e.g., material storage, loading/unloading, vehicle maintenance)
- Size of the operation
- Type, duration, and intensity of precipitation events

The activities, pollutant sources, and pollutants detailed in Table 1 are commonly found at transportation equipment, industrial, or commercial machinery manufacturing facilities.

*Table 1. Common Activities, Pollutants Sources, and Associated Pollutants at Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities*

| Activity | Pollutant Source | Pollutant |
|---|---|---|
| Outdoor material loading/unloading | Wooden pallets, castings, foundry sand, limestone, spills/leaks from material handling equipment, solvents | Total suspended solids (TSS), turbidity, dust, oil and grease, organics |
| Outdoor material and equipment storage | Foundry sand, limestone, used equipment, above ground storage tanks, scrap metal, oil and grease, raw materials (e.g., aluminum, steel, iron, copper), castings, solvents, acids, and paints | TSS, turbidity, dust, oil and grease, heavy metals, organics |
| | Stored hazardous waste, including: paint wastes, solvent wastes, and sludge wastes; stored nonhazardous wastes: glass, tires, used wooden pallets, used equipment and machinery, plastics and rubber wastes | TSS, oils, solvents |
| Air emissions from stacks and ventilation systems | Engine exhaust from manufacturing equipment, paint residue, particulates in fumes from metal processing activities such as cutting, grinding, shaping, and welding | Particulates, heavy metals |
| Vehicle fueling and maintenance | Parts cleaning | Solvents, oil, heavy metals, acid/alkaline wastes |
| | Waste disposal of oily rags, oil and gas filters, batteries, coolants, degreasers | Oil, heavy metals, solvents, acids |
| | Fluid replacement including hydraulic fluid, oil, transmission fluid, radiator fluids, and grease | Oil and grease, arsenic, lead, cadmium, chromium, COD, and benzene |
| | Fueling | Diesel, gasoline, oil |

**EXHIBIT C Page 14**

## What BMPs can be used to minimize contact between stormwater and potential pollutants at my facility?

A variety of BMP options may be applicable to eliminate or minimize the presence of pollutants in stormwater discharges from transportation equipment, industrial, or commercial machinery manufacturing facilities. You will likely need to implement a combination or suite of BMPs to address stormwater runoff at your facility. Your first consideration should be for pollution prevention BMPs, which are designed to prevent or minimize pollutants from entering stormwater runoff and/or reduce the volume of stormwater requiring management. Prevention BMPs can include regular cleanup, collection and containment of debris in storage areas, and other housekeeping practices, spill control, and employee training. It may also be necessary to implement treatment BMPs, which are engineered structures intended to treat stormwater runoff and/or mitigate the effects of increased stormwater runoff peak rate, volume, and velocity. Treatment BMPs are generally more expensive to install and maintain and include oil-water separators, wet ponds, and proprietary filter devices.

BMPs must be selected and implemented to address the following:

### Good Housekeeping Practices

Good housekeeping is a practical, cost-effective way to maintain a clean and orderly facility to prevent potential pollution sources from coming into contact with stormwater. It includes establishing protocols to reduce the possibility of mishandling materials or equipment and training employees in good housekeeping techniques. Common areas where good housekeeping practices should be followed include trash containers and adjacent areas, material storage areas, vehicle and equipment maintenance areas, and loading docks. Good housekeeping practices must include a schedule for regular pickup and disposal of garbage and waste materials and routine inspections of drums, tanks, and containers for leaks and structural conditions. Practices also include containing and covering garbage, waste materials, and debris. Involving employees in routine monitoring of housekeeping practices has proven to be an effective means of ensuring the continued implementation of these measures.

### Minimizing Exposure

Where feasible, minimizing exposure of potential pollutant sources to precipitation is an important control option. Minimizing exposure prevents pollutants, including debris, from coming into contact with precipitation and can reduce the need for BMPs to treat contaminated stormwater runoff. It can also prevent debris from being picked up by stormwater and carried into drains and surface waters. Examples of BMPs for exposure minimization include covering materials or activities with temporary structures (e.g., tarps) when wet weather is expected or moving materials or activities to existing or new permanent structures (e.g., buildings, silos, sheds). Even the simple practice of keeping a dumpster lid closed can be a very effective pollution prevention measure.

### Erosion and Sediment Control

BMPs must be selected and implemented to limit erosion on areas of your site that, due to topography, activities, soils, cover, materials, or other factors are likely to experience erosion. Erosion control BMPs such as seeding, mulching, and sodding prevent soil from becoming dislodged and should be considered first. Sediment control BMPs such as silt fences, sediment ponds, and stabilized entrances trap sediment after it has eroded. Sediment control BMPs should be used to back-up erosion control BMPs.

### Management of Runoff

Your SWPPP must contain a narrative evaluation of the appropriateness of stormwater management practices that divert, infiltrate, reuse, or otherwise manage stormwater runoff so as to reduce the discharge of pollutants. Appropriate measures are highly site-specific, but may include, among others,

vegetative swales, collection and reuse of stormwater, inlet controls, snow management, infiltration
devices, and wet retention measures.

A combination of preventive and treatment BMPs will yield the most effective stormwater
management for minimizing the offsite discharge of pollutants via stormwater runoff. Though not
specifically outlined in this fact sheet, BMPs must also address preventive maintenance records or
logbooks, regular facility inspections, spill prevention and response, and employee training.

All BMPs require regular maintenance to function as intended. Some management measures have
simple maintenance requirements, others are quite involved. You must regularly inspect all BMPs to
ensure they are operating properly, including during runoff events. As soon as a problem is found,
action to resolve it should be initiated immediately.

Implement BMPs, such as those listed below in Table 2 for the control of pollutants at transportation
equipment, and industrial and commercial machinery manufacturing facilities, to minimize and
prevent the discharge of pollutants in stormwater. Identifying weaknesses in current facility practices
will aid the permittee in determining appropriate BMPs that will achieve a reduction in pollutant
loadings. BMPs listed in Table 2 are broadly applicable to transportation equipment, industrial, or
commercial machinery manufacturing facilities; however, this is not a complete list and you are
recommended to consult with regulatory agencies or a stormwater engineer/consultant to identify
appropriate BMPs for your facility.

*Table 2.  BMPs for Potential Pollutant Sources at Transportation Equipment, Industrial, or
Commercial Machinery Manufacturing Facilities*

| Pollutant Source | BMPs |
|---|---|
| Outdoor material loading and unloading | ❑ Confine loading/unloading activities to a designated area outside drainage pathways and away from surface waters |
| | ❑ Load/unload indoors or in a covered area. |
| | ❑ Cover loading/unloading area with permanent cover (e.g., roofs) or temporary cover (e.g., tarps). |
| | ❑ Close storm drains during loading/unloading activities in surrounding areas. Avoid loading/unloading materials in the rain. |
| | ❑ Slope the impervious concrete floor or pad to collect spills and leaks and convey them to proper containment and treatment. |
| | ❑ Provide overhangs or door skirts to enclose trailer ends at truck loading/unloading docks. |
| | ❑ For rail transfer, a drip pan shall be installed within the rails to collect spillage from the tank. |
| | ❑ Where liquid or powdered materials are transferred in bulk to/from truck or rail cars, ensure hose connection points at storage containers are inside containment areas, or drip pans are used in areas where spillage may occur which are not in a containment area. |
| | ❑ Inspect all containers prior to loading/unloading of any raw or spent materials. |
| | ❑ Provide diversion berms, dikes or grassed swales around the perimeter of the area to limit run-on. |
| | ❑ Use dry cleanup methods instead of washing the areas down. |
| | ❑ Regularly sweep area to minimize debris on the ground. |
| | ❑ Provide dust control if necessary. When controlling dust, sweep and/or apply water or materials that will not impact surface or ground water. |
| | ❑ Develop and implement spill prevention, containment, and countermeasure (SPCC) plans |
| | ❑ Train employees on proper loading/unloading techniques and spill prevention and response. |

**Table 2.  BMPs for Potential Pollutant Sources at Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities (continued)**

| Pollutant Source | BMPs |
|---|---|
| Outdoor material storage | ❑ Cover storage areas with roofs or tarps.<br>❑ Confine storage of raw materials, parts, and equipment to designated areas away from high traffic, outside drainage pathways and away from surface waters.<br>❑ Provide secondary containment around chemical storage areas.<br>❑ If containment structures have drains, ensure that the drains have valves, and that valves are maintained in the closed position. Institute protocols for checking/testing stormwater in containment areas prior to discharge.<br>❑ Provide diversion berms, dikes or grassed swales around the perimeter of the area to limit run-on.<br>❑ Direct stormrwater runoff to an on-site retention pond.<br>❑ Ensure that all containers are properly sealed and valves closed.<br>❑ Conduct container integrity testing and provide leak detection.<br>❑ Inspect storage tanks and piping systems (pipes, pumps, flanges, couplings, hoses, and valves) for failures or leaks and perform preventive maintenance.<br>❑ Plainly label all containers.<br>❑ Maintain an inventory of fluids to identify leakage.<br>❑ Wash and rinse containers indoors before storing them outdoors.<br>❑ Train employees on proper spill prevention and response techniques.<br>❑ Train employees on proper waste control and disposal. |
| Foundry sand and limestone storage | ❑ Confine storage to areas outside of drainage pathways and away from surface waters.<br>❑ Divert stormwater around storage areas with vegetated swales, and/or berms.<br>❑ Practice good housekeeping measures such as frequent removal of dust and debris. Cleanup methods may include mobile sweepers, scrapers, or scoops.<br>❑ Use control measures such as berms, silt fences or waddles to control sediment from leaving storage area.<br>❑ Train employees in good housekeeping measures. |
| Waste management | ❑ Store waste in enclosed and/or covered areas.<br>❑ Store wastes in covered, leak proof containers (e.g., dumpsters, drums).<br>❑ Cover the dumpsters or move them indoors.<br>❑ Use linked dumpsters that do not leak.<br>❑ Provide a lining for the dumpsters.<br>❑ Direct runoff to on-site retention pond.<br>❑ Ensure hazardous and solid waste disposal practices are performed in accordance with applicable federal, state, and local requirements.<br>❑ Ship all wastes to offsite licensed landfills or treatment facilities. |
| Particulate emission management | ❑ Clean around vents and stacks.<br>❑ Place tubs around vents and stacks to collect particulates.<br>❑ Inspect air emission control systems (e.g., baghouses) regularly and repair or replace when necessary. |

**Table 2.  BMPs for Potential Pollutant Sources at Transportation Equipment, Industrial, or
Commercial Machinery Manufacturing Facilities (continued)**

| Pollutant Source | BMPs |
|---|---|
| Vehicle fueling | ☐ Conduct fueling operations (including the transfer of fuel from tank trucks) on an impervious or contained pad or under a roof or canopy where possible. Covering should cover extend beyond spill containment pad to prevent rain from entering.<br><br>☐ When fueling in uncovered area, use concrete pad (not asphalt).<br><br>☐ Use drip pans where leaks or spills of fuel can occur and where making and breaking hose connections.<br><br>☐ Use fueling hoses with check valves to prevent hose drainage after filling.<br><br>☐ Clean up spills and leaks immediately.<br><br>☐ Minimize/eliminate run-on onto fueling areas with diversion dikes, berms, curbing, surface grading or other equivalent measures.<br><br>☐ Collect stormwater runoff and provide treatment or recycling.<br><br>☐ Use dry cleanup methods for fuel area rather than hosing the fuel area down. Sweep up absorbents as soon as spilled substances have been absorbed.<br><br>☐ Regularly inspect and perform preventive maintenance on storage tanks to detect potential leaks before they occur.<br><br>☐ Inspect the fueling area for leaks and spills<br><br>☐ Provide curbing or posts around fuel pumps to prevent collisions from vehicles.<br><br>☐ Discourage "topping off" of fuel tanks.<br><br>☐ Train personnel on vehicle fueling BMPs |
| Vehicle maintenance | **Good Housekeeping**<br><br>☐ Plug floor drains that are connected to the storm or sanitary sewer; if necessary, install a sump that is pumped regularly.<br><br>☐ Use drip plans, drain boards, and drying racks to direct drips back into a sink or fluid holding tank for reuse.<br><br>☐ Drain all parts of fluids prior to disposal. Oil filters can be crushed and recycled.<br><br>☐ Promptly transfer used fluids to the proper container; do not leave full drip pans or other open containers around the shop. Empty and clean drip pans and containers.<br><br>☐ Dispose of greasy rags, oil filters, air filters, batteries, spent coolant, and degreasers properly.<br><br>☐ Label and track the recycling of waste material (e.g., used oil, spent solvents, batteries).<br><br>☐ Maintain an organized inventory of materials.<br><br>☐ Eliminate or reduce the number or amount of hazardous materials and waste by substituting nonhazardous or less hazardous materials.<br><br>☐ Clean up leaks, drips, and other spills without using large amounts of water.<br><br>☐ Prohibit the practice of hosing down an area where the practice would result in the exposure of pollutants to stormwater.<br><br>☐ Clean without using liquid cleaners whenever possible.<br><br>☐ Do all cleaning at a centralized station so the solvents stay in one area.<br><br>☐ If parts are dipped in liquid, remove them slowly to avoid spills.<br><br>☐ Do not pour liquid waste down floor drains, sinks, outdoor storm drain inlets, or other storm drains or sewer connections. |

*Table 2.  BMPs for Potential Pollutant Sources at Transportation Equipment, Industrial, or Commercial Machinery Manufacturing Facilities (continued)*

| Pollutant Source | BMPs |
|---|---|
| Vehicle maintenance *(continued)* | **Minimizing Exposure**<br><br>❑ Perform all cleaning operations indoors or under covering when possible. Conduct the cleaning operations in an area with a concrete floor with no floor drainage other than to sanitary sewers or treatment facilities.<br><br>❑ If operations are uncovered, perform them on concrete pad that is impervious and contained.<br><br>❑ Park vehicles and equipment indoors or under a roof whenever possible where proper control of oil leaks/spills is maintained and exposure to stormwater is prevented.<br><br>❑ Watch vehicles closely for leaks and use pans to collect fluid when leaks occur.<br><br>**Management of Runoff**<br><br>❑ Use berms, curbs, or similar means to ensure that stormwater runoff from other parts of the facility does not flow over the maintenance area.<br><br>❑ Collect the stormwater runoff from the cleaning area and providing treatment or recycling. Discharge vehicle wash or rinse water to the sanitary sewer (if allowed by sewer authority), wastewater treatment, a land application site, or recycled on-site. DO NOT discharge washwater to a storm drain or to surface water.<br><br>**Inspections and Training**<br><br>❑ Inspect the maintenance area regularly for proper implementation of control measures.<br><br>❑ Train employees on proper waste control and disposal procedures. |

## What if activities and materials at my facility are not exposed to precipitation?

The industrial stormwater program requires permit coverage for a number of specified types of industrial activities. However, when a facility is able to prevent the exposure of ALL relevant activities and materials to precipitation, it may be eligible to claim no exposure and qualify for a waiver from permit coverage.

If you are regulated under the industrial permitting program, you must either obtain permit coverage or submit a no exposure certification form, if available. Check with your permitting authority for additional information as not every permitting authority program provides no exposure exemptions.

## Where do I get more information?

For additional information on the industrial stormwater program see
**www.epa.gov/npdes/stormwater/msgp**.

A list of names and telephone numbers for each EPA Region or state NPDES permitting authority can be found at **www.epa.gov/npdes/stormwatercontacts**.

## References

Information contained in this Fact Sheet was compiled from EPA's past and current Multi-Sector General Permits and from the following sources:

◆ U.S. Department of Defense, Department of the Navy. "Storm Water Best Management Practices (BMP) Decision Support Tool - Stormwater Pollution Prevention Options by Category: Vehicle Maintenance."
**http://205.153.241.230/stormwaterbmp/cgi-bin/P2Cat.cfm?Cat=Vehicle%20Maintenance**

◆ U.S. Department of Defense, Department of the Navy. "Storm Water Best Management Practices (BMP) Decision Support Tool—Stormwater Pollution Prevention Options by Category: Fueling."

http://205.153.241.230/stormwaterbmp/cgi-bin/P2Cat.cfm?Cat=Vehicle%20Fueling

◆ U.S. EPA. September 1992. Stormwater Management for Industrial Activities: Developing Pollution Prevention Plans and Best Management Practices. EPA 832-R-92-006.

www.epa.gov/npdes/stormwater

◆ U.S. EPA, Office of Science and Technology. 1999. Preliminary Data Summary of Urban Stormwater Best Management Practices. EPA-821-R-99-012

www.epa.gov/OST/stormwater/

◆ U.S. EPA, Office of Wastewater Management. *NPDES Stormwater Multi-Sector General Permit for Industrial Activities (MSGP)*.

www.epa.gov/npdes/stormwater/msgp